Christian, J.
This case is brought up by appeal from a decree of the circuit court of Rockingham.
The originial bill was filed by the executor of J. W. Blose, who sued for himself and all other creditors of Jacob Miller who might make themselves parties to the suit.
Its object was to subject the real estate in the hands of the heirs of Jacob Miller to the payment of his debts. The bill sets out certain judgments recovered against his administrator after his death, and the executions issued thereon, returned by the sheriff, “ no assets in the hands of administrator ”; and after alleging that the said Jacob Miller died seized of considerable real estate, now in the hands of his heirs, and that the rents and profits of the real estate for five years will not pay these judgments, asks that the same may be sold and the proceeds applied to the payment of these judgments. The bill further charges-that the administrators have never settled any account of their administration on the estate of said Jacob Miller, and asks for a decree compelling a settlement of such account, and that an account may also be taken of the debts of the decedent. The heirs and administrators are made parties to this suit.
The heirs of Jacob Miller were his son, "William H. Miller, and his daughter, Mary, who intermarried with-John O. Walker. William H. Miller and Walker had *747 qualified as administrators of Jacob Miller. They answered the bill. They allege in their answers that they had settled up the personal estate of their intestate, and that there was not enough of the personal estate to pay his debts; that the personal effects which came into their hands were sold in October, 1863, for Confederate currency, and that in many instances the creditors refused to receive that currency. They admit that Jacob Miller left a tract of land containing 732 acres, but affirm that the rents and profits would be sufficient to pay his debts in five years. This was the only issue made by the original bill and answers thereto. The circuit court, at its September term, 1870, rendered a decree directing one of its commissioners to “ take an account of the outstanding liabilities of the estate of Jacob Miller, deceased, and their priorities, if any, and also to settle the administration accounts of the defendants, Walker and Miller, as administrators aforesaid, and to ascertain the real and personal assets belonging to said estate.”
A commissioner of the court duly proceeded to execute this decree, and upon the return of this report, it was excepted to by the defendants, Miller and Walker, by various exceptions filed by them. The only one now necessary to notice, is that which relates to the report as to the real estate of the decedent. This is excepted to upon the ground that the tract of 732 acres was not, in whole, the property of the said Jacob Miller; but that he was the owner of only one-half thereof. The defendants filed with their exceptions a deed from Stevens and wife, conveying the said tract of land to Jacob Miller and one William Kite, jointly, bearing date August, 1831. Upon this report and exceptions thereto, the circuit court,, at its May term, 1871, directed a partition of said land, and appointed commissioners to make division and allotment of said land—one-half to the heirs of Sarah Miller (who was the daughter of William Kite, and wife of Jacob *748 Miller), and the other to the creditors of Jacob Miller. But before the action of these commissioners had been - confirmed, the cause, “for reasons appearing to the court,” was remanded to rules, and leave given to complainant to file an amended and supplemental bill.
The amended and supplemental bill was accordingly filed at December rules, 1871. In this bill it was alleged by way of supplement and amendment, that in the yeai” 1843, the heirs of William Kite (of whom Sarah Miller, the wife of Jacob Miller, was one), made partition of all of the real estate of said William Kite among themselves, and executed and delivered to each other various deeds to carry out this partition. These several deeds are all made exhibits with this amended bill. Among them is a deed executed by all the heirs of Kite (six in number), except Mrs. Sarah Miller, conveying the 732 acre tract in fee to Jacob Miller for the consideration expressed on the face of the deed, of $8,000. The bill charges that the whole of this tract, instead of one-half thereof, as charged in the original bill, is subject to the debts of said Jacob Miller, and that the rents and profits of the same for five years will not be sufficient to pay the debts. This amended bill is answered by the heirs and administrators of Jacob Miller. The respondents, although they had admitted in their answer to the original bill that the’732 acre tract was the property of Jacob Miller, and in their amended answer to said original, they admit that one-half of said land was owned in fee by said Jacob Miller, they now, in answer to the amended bill,, deny that he was ever.seized in fee of any part of the 782 acre tract; they deny that he ever paid any part of the purchase money of said land during the lifetime of William Kite or afterwards; they aver that the greater part of the purchase money was paid by William Kite in his lifetime, and the residue thereof by his administrators after his death; they allege that the equitable *749 title to said land never was vested in said Miller, and that the legal title which vested in him, was a trust for the benefit of his wife and children; they insist that as Jacob Miller paid no part (as they allege) of the purchase money, the 782 acre tract was a part of the real estate of "William Kite, and was so treated in the partition of that estate among his heirs; they admit the execution of the deeds exhibited with the amended bill by the heirs of William Kite, but insist that Mrs. Miller still held an equitable estate in the 732 acre tract; and that although the deeds of the Kites conveyed to Jacob Miller the legal title, he held the land subject to a trust in favor of his wife and her .heirs, and that therefore the land is not subject to his debts.
Depositions were taken by the defendants to sustain these averments of the answer to the amended bill; and the cause coming on to be heard at the October temí, 1873, the court held “that the children of Sarah Miller, wife of Jacob Miller, deceased, are entitled by descent from their mother, Sarah Miller, deceased, to a one-fourteenth interest in the said 732 acre tract of land in the bill and proceedings mentioned, and that the remainder thereof is subject to be sold to pay the debts of said Jacob Miller, deceased; that he died seized and possessed of the remainder (thirteen-fourteenths) of said land in fee simple, and that there was no resulting trust in said land for the benefit of said children of Sarah Miller.” • And the decree then directs commissioners appointed for that purpose to make partition of said land, assigning one-fourteenth thereof to the heirs of said Sarah Miller, as and for their inheritance in said land, free from all demands of whatever nature against Jacob Miller, deceased, and the residue thereof to said children of Sarah Miller as and for their inheritance and interest in said lands through their father, the said Jacob Miller, subject to be sold to meet and pay off all just demands against his *750 estate. The commissioners were directed to report their proceedings under this 'decree to the court for its further order.
From this decree an appeal was allowed by one of the judges of this court on petition of the heirs of Mrs. Sarah Miller.
T am of opinion that there is no error in the decree of the circuit court.
Jacob Miller and his heirs had been in possession of the tract of land now claimed as the trust property of Mrs. Miller'¡for forty years and upwards. That possession was held under two deeds, one recorded in 1831, and the other in 1843. By both deeds the title is conveyed to Jacob Miller. Upon the face of these deeds no trust is created in favor of Mi’s. Miller or any one else. They are absolute,’ and convey the property to Miller without condition or reservation. The deed executed and recorded in the year 1831, is a deed from Stevens and wife, conveying 732 acres of land to 'William Kite and Jacob Miller, jointly, “in consideration of the sum of seven thousand eight hundred and eighty-four dollars, to them in hand paid by the said William Kite and Jacob Miller.” The deed executed and recorded in 1843, was executed by the heirs of William Kite, by which they conveyed their interest in said land “for the consideration of eight thousand dollars, to them in hand paid by said Jacob Miller,” “to the only proper use and behoof of him the said Jacob Miller, his heirs and assigns forever.”
Uow, after the lapse of nearly forty-five years, it is claimed that this land, though held by Jacob Miller for this great length of time, under deeds absolute on their face, and which have been on record nearly half a cemtury, informing his creditors and the world who chose to deal with him that the property was absolutely his, it is now claimed that he simply held the naked legal title, and that he w.as but a trustee for his wife and children, *751 and that his creditors cannot subject it to the payment of their debts.
The evidence to establish such a claim in the face of absolute deeds so long of record, must be very clear and explicit, and such as to leave no doubt as to the character of the transaction. The basis of the claim of the appellants, that Miller held the land in trust for his wife and her heirs, is that the whole of the purchase money was paid by Kite in his lifetime, and by his administrators after his death.
Where the trust does not arise upon the face of the deed, but is raised upon the payment of the purchase money, which creates a trust which is to override the deed, the proof must be very clear, and.mere parol evidence ought to be received with great caution. Bank of U. S. v. Carrington, 7 Leigh, 581.
A resulting trust must arise at the time of the execution of the conveyance. Payment or advance of the purchase money before or at the time of the purchase, is indispensable; a subsequent payment will not by relation attach a trust to the original purchase, for the trust arises out of the circumstances that the moneys of the real and not the nominal purchaser formed at the time the consideration of that purchase, and became converted into land. See 1 Lead. Cases in Eq. p. 177, and cases there cited. In Botsford v. Burr, 2 John. Ch. R. 405,414, Chancellor Kent said: “ The trust must have been coeval with the deeds, or it cannot exist at all. * * * The trust results from the original transaction at the time it takes place, and at no other time; and it is founded on the actual payment of money, and on no other ground. It cannot be mingled or confounded with any subsequent ■dealing whatever.” Kow, the ground of a resulting trust is, that payment of the purchase money is an equity to have the land. But the mere fact of payment will not always be sufficient to raise a clear presumption of a *752 trust. But evidence of intention must often enter into the fact whether that payment is such an equity under circumstances. The payment by the father of purchase money of land conveyed to his son, or to his nephew, or to his son-in-law, or to any one else towards whom the party stands in loco parentis, would not, of itself, create a resulting trust. See 1 Lead. Cas. Eq. 179, and cases there cited. So that if “William Kite had paid the whole of the purchase money for the whole tract of 732 acres, and the whole tract had been conveyed in fee to Jacob Miller, who had married his daughter, this would not of itself have created a trust in favor of William Kite and his heirs. It would have been regarded only as a gift to one towards whom the grantor stood in loco parentis.
But there is nó proof in the record to show either that the whole of the purchase money was paid by Kite, or that if so paid, it was under such circumstances as would create a resulting trust at the time of the execution of the conveyance. Indeed, the only evidence as to how or by whom the purchase money was paid, (except the deed itself, which acknowledges payment of the whole of the purchase money in cash by Kite and Miller), is a receipt endorsed on the back of a $600 bond showing that a balance of $200 on that bond was paid by the administrators. How, when, or by whom, the balance of the purchase money was paid, there is literally no evidence to contradict the receipt set out in the deed.
It is true there are in the record the depositions of two witnesses taken more than forty years after the execution of the deed, but they utterly fail to prove anything as to the payment of the purchase money. Neither of these witnesses knew anything, nor do they say anything, about the payment of the purchase money by Kite. One of them expresses the opinion that he did not think that from Miller’s pecuniary condition he could *753 have paid for any considerable amount of real estate; though he said he made considerable money, and he knew of his borrowing money about that time from witness’ father. He says of Kite that he was a punctual man, and competent to pay such contracts as he made; and he estimates his property as worth $60,000. He does not pretend to say that Kite paid the whole of the purchase money, or what part he paid, or what part Miller paid; he knew nothing about it. The other witness does not even speak of the pecuniary condition of Miller, and is totally ignorant of any facts tending to show how and by whom the purchase money was paid. Surety upon this vague testimony, taken forty years after the transaction, this court will not assume without proof, and in the face of the deed of the parties, that Kite paid all the purchase money, and raise upon such evidence as this a resulting trust in favor of the heirs of Kite, to the exclusion of the creditors of Jacob Miller, who held this land for forty years under a deed of record ever since October, 1831. If a resulting trust can be set up under these circumstances, there would be no security of title to' any lands in this commonwealth.
But it is insisted that whatever may have been the interest of Jacob Miller, under the deed of 1831, from Stevens and wife to Kite and Miller, in the 732 acre tract, yet that in a partition of the real estate of William Kite, made among his heirs in 1843, one moiety of this tract was- regarded by Jacob Miller and his wife and the other heirs of William Kite, as an advancement by said Kite in his lifetime to his daughter Sarah Miller; and that the same was surrendered and thrown into hotchpot with the rest of the estate of said William Kite, and the said Sarah Miller thereby came in for equal distribution of said estate with the other heirs of said Kite; and it is argued that although the deed executed by the heirs of *754 "William Kite conveys this land in fee to Jacob Miller for a consideration paid by him, as expressed by the deed, that he in fact held it under the deed of 1843 in trust for Ms wife, it being her land descended from her father, and of which she never divested herself.
Now, all this is mere theory and conjecture, not supported by any reliable or certain testimony, but contradicted by the terms of the deed under which for forty years Jacob Miller has held this land. Much stress is laid by the learned counsel for the appellants upon the answers of the defendants. These answers, as to the transactions alleged with reference to the partition of the real estate of William Kite, are not responsive to the hill, but in this respect are merely affirmative allegations, which they must prove.
It must be remembered that these answers are the answers of the personal representatives of Jacob Miller, the one a son-in-law, who, at the time of the transaction in 1843, was a stranger to the family, the other a son, who was then an infant, if, indeed, he was then in being at all. Their averments were of matters of which they could have no possible pensonal knowledge, and to which they were not called upon to answer or make discovery; hut were affirmative, not responsive, and must be regarded only as making up issues, but not as evidence in themselves. Lyons v. Miller, 6 Gratt. 427. Now, looking to the record,- we find that.the deed of 1843 is a.deed of bargain and sale between the heirs of Kite and Jacob Miller, by which the said heirs convey the land therein described to Jacob Miller for and “in consideration of the sum of $8,000 lawful money in hand paid them by the said Jacob Miller, to the only proper use and behoof of him, the said Jacob Miller, his heirs and assigns forever.” The answers allege that the expressed consideration was not the true consideration, and that this conveyance was intended to convey the land to Jacob Miller in trust for *755 Mrs. Sarah Miller. This allegation is not sustained by any sufficient proof in-the cause. There is only one witness who speaks at all upon the subject. After stating that there was a partition and allotment of the real estate of William Kite, shortly after his death, and that Jacob Miller and all the heirs treated the 732 acre tract as part of the real estate of William Kite, he makes the following answer to the following leading questions put to him by counsel:
Question. “At said partition and division did Jacob Miller set up a claim to any other interest in said lands, except through his wife, as one of the heirs of said Kite, and did not he receive and accept said 732 acre tract of land as his wife’s interest in William Kite’s estate ? ”
Answer. “He did not claim any more than that; that Avas allotted to him at that time. He claimed this piece of land; wheD they divided they agreed that he should take this piece of land; he received and accepted it as his wife’s interest in William Kite’s estate;' he had it in his possession until his death.”
How, this is all the evidence on the subject. If this evidence was in direct contradiction of the terms of the deed, it would certainly not be sufficient to prove a different consideration from that stated in the deed, or to create a trust estate in favor of Mrs. Miller, and divert the title from Jacob Miller and his heirs, which the plain terms of the deed convey to him absolutely. But in point of fact this evidence is perfectly consistent with the deed. Miller, no doubt, did not claim any more land than the-witness says was allotted to him. Ho doubt he was satisfied to receive the moiety of the 732 acres as the full share of his wife in Kite’s estate, but the deed was made to him by the heirs because he had relinquished to them his life estate in four tracts of land, and it may be his whole interest in the personalty, which Avas larger. Taking every word of this witness, spoken upwards of thirty *756 years after the transaction took place, as true, his evidence is not inconsistent with the deeds exhibited by the plaintiff. The consideration named in the deed is $8,000. This $8,000, it may be, consisted of the estimated value of the life estate of Miller in the seventh of the balance of the real estate, and the right to have assigned to him in fee one-seventh of the personal estate. The personal estate must have been very large. Kite’s whole estate is estimated by appellants’ witness at sixty thousand dollars, and the appellants estimate in their answer the real estate at $35,000. This would leave $25,000 of personalty to one-seventh of which Miller was entitled. Mrs. Miller was entitled to one-seventh of each of the four tracts in which she united in deeds of her husband to the other heirs. The estimated value of all these interests might have well made up the sum of $8,000. But the appellants claim that this 732 acre tract was the inheritance of Mrs. Miller, derived from her father, and that she never divested herself of her title therein by any act of hers, and that the title conveyed to her husband was intended for her benefit, and that though in form it conveyed the fee, it was intended by the parties to the partition that it should be held by Jacob Miller in trust for his wife. This claim of the appellants is founded on a total misconception of the record evidence in the case, as well as of the effect of the decree of the court below. That decree does secure to the heirs of Mrs. Miller all of the real estate which she inherited from her father, and which she had not conveyed in her lifetime in the mode prescribed by law, to-wit: by deed and privy examination.
Mrs. Miller was entitled to one-seventh of the real estate of her father, William Kite. This consisted of four tracts of land, besides a moiety of the 732 acre tract. She surrendered her interest in all these lands, and united with her husband in deeds to the other heirs. These deeds are all in the record, and in each there is certified, *757 in regular form, her privy examination. There is no proof, nor even charge, that any fraud or misrepresentation was practiced upon her by her husband or hér coheirs, who were her brothers and sisters. We cannot presume that she did not understand the legal effect of her uniting in these deeds. On the contrary, we must presume, in the absence of all evidence to the contrary, that these deeds were fully explained to her, and that she executed them with a full knowledge of their legal effect. Ho doubt she would have united with the other heirs in the deed to Jacob Miller, but that Jacob Miller was her husband, and she could make no conveyance to him. She, no doubt, was perfectly willing that the legal title to the whole 782 acre tract should be conveyed to her husband instead of to herself. There might have been the strongest considerations why this should be done. For aught we know, he might have promised, or did actually settle upon her the personal estate, or other real estate. After thirty years have elapsed, and the records destroyed, it is impossible to say what were the motives or considerations which induced her to enter into this arrangement It is all left now to mere conjecture. There might have been cogent reasons and the best consideration why she should have consented that her coheirs should convey their interest to her husband instead of to her sole use and benefit. But however this may be, she did divest herself, in the mode prescribed by the statute, of her title to all the real estate she inherited from her father, except her interest in the 732 acre tract. She made no objection, so far as this record shows, to-the conveyance of the land to her husband. These deeds have been of record for upwards of thirty years, and no question in all these years has been made as to the title or possession under them. It is too late now to assail them. Whatever may be our sympathies, in a controversy between creditors and the heirs of a married woman *758 who has permitted her inheritance to be conveyed to her husband, it would be dangerous to the last degree to-establish a principle, upon which, on the vague and uncertain testimony of witnesses, taken thirty years after the transaction, the recorded titles of over a quarter of a century are to be overthrown.
The decree of the court below carefully secures to Mrs. Miller so much of the land as she did not convey away in the mode prescribed by law. In doing this it has done-all that can be legitimately asked for her and her heirs.
It is a noteworthy fact, and one of great significance, that the claim now asserted by her heirs, was neveiasserted by Mrs. M.ller in her lifetime, though she lived years after the death of her husband. ' It was not even asserted by the heirs in their answer, to the original bill. It is now asserted to defeat- the just demands of creditors.
Upon the whole case, I am of opinion that there is no-error in the decree of the circuit court, and that the same should be affirmed.
Anderson, J. The appellee, Jacob Blose’s executor, in 1870, brought a creditor’s bill against John O. Walker and "William II. Miller, administrators of Jacpb Miller, deceased, and John C. Walker and Mary 0., his wife, and William II. Miller, the said Mary O. and William H. being the children and heirs of Jacob Miller, deceased, for the settlement of the administration accounts and an account of the intestate’s' debts, and to subject the personal estate, if anj^, and also the tract of seven hundred and thirty-two acres of land in controversy, to the-payment of said debts.
Jacob C. Walker first answered the bill. Then J. O. Walker and William H. Miller filed an amended answer.. The plaintiff then filed an amended bill. And J. 0.. Walker and Mary 0., his wife, and William H. Miller, *759 in their own right, and J. C. Walker and W. H. Miller, as administrators of Jacob Miller, filed an- answer to the original and amended bills. This last answer, which is the only one in which Mary O. Walker joined, sets forth clearly, and I think the evidence shows, with substantial correctness, the true history and material facts of the case; and it seems to me that the said Mary O. nor her brother should be held responsible for any statements which are made in the previous answers in conflict with it, which were evidently made by J. C. Walker in ignorance of what was the true state of the case.
The tract of seven hundred and thirty-two acres of land in controversy wTas conveyed by Edward Stevens jointly to William Kite and Jacob Miller, his son-in-law, for the consideration of $7,884. There is no evidence that any part of it was intended by William Kite as an advancement to his son-in-law. On the contrary, the idea of an advancement to him is inconsistent with the transaction itself. It was their joint purchase, and Jacob Miller was equally bound with William Kite • for the purchase money. William Kite may. have intended to give his daughter, Mrs. Miller, his moiety of the land as an advancement, which is most probable, but expected Jacob Miller to pay for the other moiety, as he bound himself to do. lie was entitled to the other moiety, not as a gift or advancement from his father-in-law, but by purchase from Stevens, if he paid for it, which he did not do.
The evidence, direct and circumstantial, shows satisfactorily and conclusively to my mind, that Miller failed to pay his part of the purchase'money, and that all that had been paid in the lifetime of William Kite, or at least nearly all, was paid by him, and the residue after his death was paid by his personal representatives, as is evidenced in part by the bonds which fell due after the death of William Kite, and were paid by his administra *760 tors. Miller’s undivided moiety of the land was bound f°r his part °f the purchase money, so that in the par-of the land and negroes belonging to the estate of William Kite, in 1839, soon after his death, he and S. B. Jennings, who had intermarried with Annie Kite, another daughter of William Kite, and to whom other lands (five hundred and fifty-nine acres) had been conveyed jointly with William Kite, about a year before his death, and for which he paid no part of the purchase money, agreed that said lands in their entirety might be treated as lands belonging to the estate of William Kite, and be taken into the partition. And if any amount had been paid by Jacob Miller on the purchase in the lifetime of William Kite, which it wTould seem must have been very inconsiderable, if any, it evidently was accounted for to him out of the estate of which he was one of the administrators..
The real estate of William Kite as valued by his heirs for partition, was worth a little over $85,000, and his whole estate, real and personal, at least $60,000, which would give to each of his seven children a fraction over $8,571, after the death of the widow. She died on the 1st of January, 1843, and shortly after her death a final partition of the real and personal estate was made, and deeds were mutually executed by the heirs to each other of the lands which had been allotted to them respectively, in the parol partition of 1839, except that the lands allotted to Mrs. Miller were conveyed by the heirs to her husband, in which neither she nor Joseph H. Kite, who was a minor, united; and the lands which were allotted to Mrs. Jennings were conveyed to her husband, in which she and the said minor did not join. As will be seen the share of each heir in the real estate, if it had been equally divided amongst them, would have been of the value of $5,000. But it was a partition and division of real and personal estate together, as is *761 authorized by the statute, and the lands allotted to Mrs. Miller being valued at $8,000, it exceeded her aliquot portion of the real estate $3,000, and was a charge on her interest in the personal estate to that amount, which left, however, a balance due her of over $500 in the personal estate.
The personal as well as the real estate is the property of the wife, but the personal estate of the wife becomes the absolute property of the husband after he has reduced it to actual possession. The only doubt I have, is whether the sum of $3,000, which was charged upon her interest in the personal estate to be used in equalizing the other heirs with her, who had received no land, or less land, was a reduction pro tanto of so much of her personal estate by her husband into possession. The conclusion least favorable to Mrs. Miller and her heirs which I have reached is, that she was entitled to at least five-eighths of the seven hundred and thirty-two acres of land in question.
Has she ever parted with that right ? It is true that she might have done so. She might have united with her husband in a deed, and conveyed it to a trustee for his benefit. We held in a recent case, Sayers & als. v. Wall & als., 26 Gratt. 354, that a direct bona fide conveyance from a husband to a wife might be supported in favor of the heirs of the wife against subsequent creditors of the husband.
But there is no evidence that she ever parted with her right to the said land, or any part of it. Her uniting with her husband and her co-heirs in deeds of conveyance of other portions of the land which descended to the heirs of William Kite, really in consideration of their allotment to her of the land in question, could not divest her of her title thereto. Kor could the conveyance of it to her husband by the other heirs after it had been *762 allotted to her in the parol partition, and thereby giving her a right to it in severalty, divest her title. It is said that we may presume that she consented to the conveyance; hut the statute has prescribed the mode, and the only mode, by which a married woman can convey her freehold estate, or consent to be divested of it. Much has been said about security of titles: what security is there to the title of a married woman, if it can be taken from her upon a mere presumption of her consent to it ?
But all the foregoing positions are vindicated, in my opinion, in Jennings v. Shacklett, post p. 765, to which I beg leave to refer. I will only add a few remarks; in relation to the. staleness of the demand, and the the effect of maintaining it upon the rights of creditors, and the argument that Mrs. Miller and her heirs have lost their rights, because of the long lapse of time since Jacob Miller took possession and held it till his death. - '
The possession - of Jacob Miller was lawful, and not inconsistent with the title asserted by the heirs of his wife. The wife being the owner in fee, he was entitled to possession by the marital right; and having had issue by hér, he was tenant by the curtesy initiate. And if he had survived her, tenant by the curtesy, and invested with an estate for life, and with the right to the possession of the whole. He died in 1863. Up to that time his possession was lawful and perfectly consistent with an estate in his wife in fee. And immediately upon his death, his wife surviving, she was in possession of the' whole as her fee, if she was entitled to a fee in' the whole; if only to five-eighths, she was in possession, thereof as of her fee, and of the residue as dower until her dower therein was assigned her. She lived until 1868, and it was not until after her death that her children, the appellants, became invested with her title.
What laches are they chargeable with ? They have *763 been in the quiet and undisturbed possession of their property. It is true under an ancient title, but that I imagine is not to its disparagement. What more could ■ they do than they have done to assert and protect their title, which was unassailed ? If there has been any laches it has been by the assailants, who have lain by and made no attempt to overturn this ancient title of Mrs. Miller, which she has enjoyed uninterruptedly and peacefully through her husband while he lived, and after his decease, through her own direct agency, as her own property, until her death in 1868, and which she transmitted to her children aud heirs at law. This suit to subject the lands to the plaintiffs’ debt, though it had accrued in 1860, was not brought until after the death of Jacob Miller in 1863, and not until after the death of Mrs. Miller in 1868. During that long period in the lifetime of Jacob Miller and of his wife, we hear of no claim of right by creditors to subject this land to the payment of their debts, and not until 'most of those who were familiar with these transactions had gone down to their graves.
It is true, there were two deeds of record which vested title in these lands in Jacob Miller—one of them as far back as in 1831, which conveyed to him the lands jointly with William Kite, his father-in-law, and the other in 1843, which conveyed the whole to him, but in which his wife did not unite. If notice to creditors were necessary that those lands were not held by Jacob Miller in absolute right, there was enough on the face of the deeds themselves and the known facts to have awakened enquiry, and to have charged creditors with constructive notice. But such notice was not necessary. With as much reason could a mortgage be resisted upon the ground that the deed was absolute on its face. Yet every day are parties permitted to prove, even by parol evidence, that a deed, though absolute on its face, was intended to *764 be a mortgage. And in the recent case of Snavely v. Pickle, 29 Gratt. 27, this court established a deed to be a mortgage by parol evidence, though the party in whom the legal title was vested on the face of the deed had been in possession since 1845. From the best considerations I have been able to give this case, I cannot concur in the opinion of the majority, and am constrained to dissent.
Moncure, P., and Staples, J., concurred in the opinion of Christian, J.
Decree affirmed.